THE FLOTTBEK.

(District Court, D. Washington, W. D.   January 6, 1902.)

1. TOWAGE—CONSTRUCTION OF CONTRACT FOR GENERAL TOWAGE SERVICES.
     A tugboat company contracted to perform towage service for all the ships of the second party "that may be in the waters of the Straits of Juan de Fuca, Puget Sound, and British Columbia, or vicinity, whether inside or outside of Cape Flattery, and that may require any towage service," for a compensation fixed by a schedule of rates contained in the contract. Held, that whether an incoming ship was within the "vicinity" of Cape Flattery, so as to be entitled to demand towage service under the contract, must be determined, in the absence of more specific provision, by the usage and practice of tugboats, in towing vessels in from the sea, as to the distance outside the cape they were accustomed to go in search of such vessels, and from which they usually took charge of them; that, in the absence of evidence showing such usage, a claim that a ship which had been driven near the shore, and had anchored in a dangerous position among the rocks and reefs 16 miles south of the cape, was in the vicinity of the cape, within the meaning of the contract, could not be sustained.

2. SALVAGE—RESCUE OF SHIP ANCHORED IN STORM NEAR REEFS—RIGHT TO COMPENSATION.
     Owing to the absence of a light-ship from her station, the German ship Flottbek sailed into dangerous proximity to the rocks and reefs along shore 16 miles south of Cape Flattery, in the night, and, being becalmed, was obliged to anchor. During the night a gale arose, with heavy seas, which continued for two days, and rendered her position one of great danger, from which she was unable to escape. On the following morning a large steamship going up the coast came to her relief in response to her signals of distress, and spent several hours in getting a towline on board, during which time she was herself in considerable danger, and her men, who manned a boat and took a line to the Flottbek, especially exposed to risk. The towline parted, and the steamer, having lost her anchor, proceeded to Tacoma, and at once, by request of the master of the Flottbek, notified a tugboat company at Seattle, which sent tugs, and they, on the third morning, rescued the ship. The wind had then abated, but the sea was still high, and the ship was unable to extricate herself unaided. It had been decided the night before to abandon her, and half the crew had gone ashore in a boat. Held, that both the steamship and the tugs performed salvage services of such an order of merit as entitled them and their crews to liberal compensation.[1]

3. SAME—DISTRIBUTION OF AWARD—CREW OF DISABLED TUG.
     One of the tugs originally sent out by the tugboat company, after reaching the open sea, which was very rough, became disabled, and was obliged to return, and another tug subsequently took her place in the service. Held that, inasmuch as her owner effected the salvage of the ship, the officers and crew of such tug were entitled to share in the award.

In Admiralty.   Actions to recover for salvage services.

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

J. M. Ashton and Williams, Wood & Linthicum, for claimant.

Metcalfe & Jurey, for libelant Saginaw Steel Steamship Co.

Struve, Allen, Hughes & McMicken, for libelant Puget Sound Tugboat Co.

HANFORD, District Judge. By reason of the absence of the government light-ship from her station at Umatilla Reef on the night of January 13, 1901, the German ship Flottbek, bound from Yokohama to Puget Sound, sailed into dangerous proximity to the rocks and reefs on the coast about 16 miles south of Cape Flattery. When land was sighted, all hands were immediately called, the yards were braced, and every possible effort was made to change the course of the ship, but just at the critical moment the wind entirely subsided, so that the vessel became helpless, with the sea driving her inshore. Then both anchors were dropped in 25 fathoms of water. Almost immediately after coming to anchor, the wind came strong from the west, and soon increased to a gale, which continued until the evening of January 15th. It is impossible to determine from the evidence whether the vessel actually dragged her anchor at any time. Her captain admits that she might have drifted a little. But this is certain: If she did not drag, then the anchors were not dropped a moment too soon, for when she was finally rescued on the morning of the 16th the distance between her stern and White Rock was less than 500 feet, and she was in a position between White Rock and a reef on which the sea was breaking. During the entire interval from 1 o'clock a. m. of the 14th until 9 o'clock a. m. of the 16th the sea was tempestuous, and the Flottbek was saved from destruction only by her anchors. The usual signals of distress were given and displayed, and soon after daylight on the 14th the steamship Matteawan, a large vessel, worth $350,000, owned by the Saginaw Steel Steamship Company, bound from San Francisco to Tacoma, responded to the call for help conveyed by the signals, and upon request of the captain of the Flottbek attempted to take her in tow. In the raging storm several hours were spent maneuvering to take a towline from one ship to the other. During this time the Matteawan was at anchor, and her violent surging on her cable broke and destroyed her windlass, and disabled her to such an extent that she was obliged to sacrifice the anchor and chain, having no means to raise it. In view of their situation, the men on the Flottbek ought to have performed the labor and encountered the risks of carrying a line from their ship to the steamer. They did so in the first instance, but the line broke, and then one of the Matteawan's boats was launched, and manned by her second officer and three others of her crew, who buffeted with the waves until a second line was passed, which was used to draw the towline from the ship to the steamer. The boat was liable to be capsized by the high-rolling waves, and I consider that these four men earned special recognition. The Flottbek's towline was finally secured on the steamer, but before any strain had been put on it other than the violent dashing of the waves, it parted. The captain of the Matteawan then, seeing that

he could not rescue the Flottbek, nor remain where she was without endangering his own vessel, signified that it was necessary for him to go on his way, and was thereupon requested by the captain of the Flottbek to report his position, and send relief; and the Matteawan did hasten as a dispatch boat to call relief, consuming in that service an extra amount of coal. She arrived at Neah Bay after dark, and spent some time there, giving an alarm by signals which resulted in a message being telegraphed to the Puget Sound Tugboat Company at Seattle. Accurate information as to the location of the Flottbek was also communicated to the Puget Sound Tug Boat Company by giving the information to the company's steamer Magic, which met the Matteawan in the Straits of Juan de Fuca; and finally on arrival at Tacoma the captain of the Matteawan sent full information to the tugboat company and to the Merchants' Exchanges at Seattle and San Francisco. The Puget Sound Tugboat Company acted with commendable promptness on receiving news that the Flottbek was in peril, brought in by the Matteawan, and communicated in the manner I have indicated. In less than one hour after receiving the message from Neah Bay on the night of the 14th, the steam tug Richard Holyoke was dispatched from Seattle. On her way to the cape she met the Wanderer, owned by the same company, and the two proceeded together towards the cape, and actually encountered heavy seas at the entrance to the straits; but the machinery of the Holyoke became disabled, and both returned to Neah Bay. The steam tug Tacoma, towing a ship down the straits, also received orders to go to the rescue of the Flottbek, and at once took the ship into Clallam Bay, and left her at anchor, and then proceeded to Neah Bay, where she met the Wanderer, and the two waited there during the night of the 15th, and when daylight came on the morning of the 16th they proceeded together, and arrived in the vicinity of the Flottbek between 8:30 and 9 o'clock a. m. At that time there was very little wind, but the waves were rolling high, washing over the decks of the tugboats, making it extremely difficult for men to stand up on the deck or do the work necessary in taking a ship in tow, and the Flottbek was rolling and surging heavily on her cables. In spite of all difficulties, a towline was promptly and skillfully passed from each of the tugs, and the Flottbek slipped her cables, sacrificing two anchors and about 195 fathoms of chain, and was towed by the two tugs to a place of safety within the straits, when the Tacoma was detached, and the towage was finished by the Wanderer to Tacoma. On the 15th, while the storm was still raging, and with no help in sight, the men on the Flottbek considered that the extreme danger of their situation justified them in taking to the boats and abandoning the ship. Accordingly, the first mate and half the crew left the ship in a boat, and effected a landing on the beach, and then gave a signal agreed upon, signifying that they had succeeded in getting ashore without any of the men being drowned. By that time the storm had commenced to abate, and the captain determined that he would not leave the vessel, and upon making that announcement those who were still in the ship decided

to remain with him. During the night the wind fell to a light breeze, and hauled around to the east, and on the morning of the 16th, before the Tacoma and the Wanderer came in sight, the captain and men on the Flottbek indulged hopes of being able to get their ship away with the help of the offshore breeze; but they had not taken any steps to do so, and the distress signals were still displayed, when the tugboats arrived. I do not think the captain of the Flottbek or his men should be criticised for being dilatory, for the wind did not have sufficient force to spread out the signal flag suspended from the mast head, and the force of the sea driving in the opposite direction held the ship with her bow pointing out to sea, and straining on her cables. It would probably have amounted to a voluntary sacrifice of the ship to have slipped the cables, and with only half her crew on board it was not practicable to raise the anchors.

By the combined efforts of those on board the Mattcawan in carrying the news of the imperiled situation of the Flottbek and of the two tugboats this valuable ship was rescued from a situation of imminent peril. The owner of the Mattcawan is entitled to be compensated for the injury resulting to that vessel from efforts in behalf of the imperiled ship in response to the direct request of her captain. The tugboat Richard Holyoke, her officers and crew, would not be entitled to salvage if the rescue had not been finally accomplished by her owner; but the manager of the company, without any hesitation whatever, on receiving news that a ship was in a dangerous situation outside of Cape Flattery, dispatched the Holyoke to attempt a rescue, because she was at hand, and the first one of the company's vessels which it was possible to send; and the effort to save was followed up by sending other vessels to assist with all the promptness possible. The Holyoke and her men were sent into the teeth of the storm. They were exposed to peril, and are entitled to share in the distribution of the reward. The number of persons and vessels participating in the saving of the Flottbek is a circumstance which I must take into account, for each man is entitled to an amount of money sufficient to make it a substantial recognition of courage and gallantry in helping to save an imperiled ship and the lives of the people on board of her. The three tugboats employed in the service were each of the value of $40,000. The answer to the libel of the Puget Sound Tugboat Company alleges as a special defense that all the services rendered by the Tacoma, Wanderer, and Richard Holyoke were contracted for, and came within the scope of a contract then in force by which the tugboat company was obligated to tow, with reasonable and quick dispatch, all the vessels owned and controlled by the owners of the Flottbek "that may be in the waters of the Straits of Juan de Fuca, Puget Sound, and British Columbia, or vicinity, whether inside or outside of Cape Flattery, and that may require any towage service," for compensation at rates specified in a table of rates contained in the contract. According to said table the contract price for towing a ship of the tonnage of the Flottbek from Cape Flattery to Tacoma, including the fee for docking and use of hawser, was $410. The

claimant has the burden of maintaining the affirmative side of this issue. Therefore as to all material facts not proven the presumption must be adverse to him, and this defense must fail unless the facts established by the evidence affords a sufficient basis for the court to decide that the Flottbek was entitled to require the assistance which the tugboats rendered under the contract, and that the company was obligated by the contract to tow her promptly from the place where she was anchored, among rocks and breakers, under the conditions described, for the amount of compensation specified. The contract is general, and was intended to provide for all towage which vessels controlled by the Flottbek's owners might require in entering the Straits of Juan de Fuca, going out to sea, and moving from place to place within the straits and the waters of British Columbia and Puget Sound, and it binds the tugboat company to tow ships requiring inward towage from Cape Flattery or that vicinity, whether inside or outside of Cape Flattery. In this particular the contract is ambiguous and uncertain. How large the circle must be to surround the zone comprehended by the word "vicinity," and how far and what direction the tugboats must go to pick up inward-bound ships in order to fulfill the requirements of this contract, are questions to which no satisfactory answer can be given without recourse to information not furnished by the words of the contract. The contract should not be held void for uncertainty if the apparent ambiguity can be eliminated by a reasonable construction, and it is my opinion that such a reasonable construction can be given to this contract as to make it plain and valid. It is manifest that the parties must have had in contemplation the usages and practice of tugboats engaged in towing vessels inward from the sea, and to have intended to incorporate that usage and practice into this contract for the purpose of fixing the limits outside of Cape Flattery within which ships of these owners might require towage at the rates specified. It is my opinion that no other construction of the contract can be given to it which will be consistent with its validity; and, giving it that construction, ships must come to the vicinity of Cape Flattery, and be within the zone usually traversed by tugboats in looking for ships to be towed into the straits, in order to make the contract applicable to them. It is certainly not a matter of common and general knowledge that the place where the Flottbek was anchored, 16 miles south of Cape Flattery, is within that zone. Without any evidence bearing upon the question, the natural inference must be that inward-bound ships, waiting for a tug, would wait on the open ocean, to the westward of Cape Flattery, and tugs would look for them there, rather than near the rocky shore south of the Cape. The claimant has failed to offer any evidence tending to prove the usage which must be considered as part of this contract, or that the place where the Flottbek was when the Tacoma and Wanderer rescued her was where she could rightfully require towage under the contract. For that reason I hold that this special defense has not been sustained.

Upon consideration of all the facts, the court awards salvage and makes distribution thereof, as follows: To the owner of the Mat-

teawan, $6,000, and to her captain, officers, and men, or the personal representatives of any who have since died, the following sums: Capt. Croscup, $500; First Officer Parker, $300; Second Officer Hornman, $300; to Quartermaster ———, $100; to Quartermaster Ole Nilson, $200; to Christian Hertz and George Lindall, seamen, each $200; to the first, second, and third assistant engineers and the carpenter, each $100; to each of the other four seamen, three oilers, six firemen, and four coal passers, $80; to the steward, $50; and to the second cook, waiter, and two mess boys, each $25; to the Puget Sound Tugboat Company, $8,000; to the captains of the Tacoma and Wanderer, each $500; to the first mate and chief engineer of each of said tugboats, each $300, and to each of the other members of the crew of said vessels, $100; to the captain of the Richard Holyoke, $200; to the first mate and engineer of said vessel, each $100; and to the other members of her crew, each $50. Interest at the rate of 6 per cent. per annum from February 1, 1901, and costs, will also be allowed.